The next case this morning is 20-30418, Perry v. H. J. Heinz Company Brands, Mr. Harrigan. Yes, your honor. Good morning, your honors. My name is Brad Harrigan. I represent the appellant, Dennis Perry. At its heart, this case is about whether small businesses have to meet some minimum sales quota in order to keep their trademark rights. And if not, can a larger competitor come along and just take that trademark away from them? The law says no, and we hope that this court agrees. On appeal, we raised four assignments of error. Today, I would like to address the first and third assignments of error. The first assignment of error concerns the trial court's decision to cancel Mr. Perry's incontestable federal trademark registration on the basis that he abandoned it for de minimis use, for failing to meet some unknown and arbitrary minimum sales quota, and because he failed to use his trademark in commerce, despite evidence of out-of-state transfers of his product and sales to out-of-state buyers. The third assignment of error concerns the court's decision to grant Kraft-Heinz's motion for summary judgment, dismissing Mr. Perry's claims for trademark infringement based on a single digit of confusion, where all of the other factors weighed heavily in Mr. Perry's favor. By way of a brief summary, Mr. Perry is a small business owner who created and sold a ketchup and mayonnaise condiment sauce under the brand name Mecha. He applied to register his trademark and registered back in 2007 with the United States Patent and Trademark Office. His trademark rights date back over 13 years. Due to his longstanding rights to this Mecha trademark, the United States Patent and Trademark Office declared Mr. Perry's trademark incontestable, pursuant to 15 U.S.C. 1115. In 2018, Kraft-Heinz came out with its own mayonnaise and ketchup condiment sauce, which it marketed and sold under the confusingly similar name Mecha. Not only did they sell the product under this confusingly similar name, they took Mr. Perry's trademark registration and used it extensively in their advertisements to sell their own competing products. Worse of all, they did this with prior knowledge of Mr. Perry's federal trademark registration. Mr. Perry believed he had a good idea, and he must have been right, because Kraft-Heinz just took it. This brings me to the first assignment of error, the trial court's decision to cancel Mr. Perry's trademark as a pendant. What is the record evidence concerning how many customers there are either in Louisiana or around the country who are familiar with your client's product? There is no survey evidence of how pervasive the knowledge is of Mr. Perry's trademark. That's not a digit of confusion. That's not something that's needed. That is something that is needed to show fame for dilution, but that's not a claim in this suit. I guess what I'm asking, though, is are there consumers who are aware of your client's product, your client's brand? Oh, absolutely, Your Honor. My client has sales of his products. He's been advertising his products since 2007 on the internet. He advertises it on multiple domain names. He has put it on his Facebook site. He has it in his hotel. He certainly has customers, and he has knowledge of his product. Of course, it pales in comparison to a multinational corporation like Kraft-Heinz, but he is a small business owner, and small business owners do deserve trademark protection. He did what he was supposed to do. He went to the trademark office. He registered his mark. That should be enough, and yes, to answer the question, he does have customers, and he does have knowledge of his mark. What he has is sales, very few sales to be sure. I think I calculated it out as $9 of profit per year or something in that neighborhood, certainly not a lot. My question is not the existence of sales. It's the existence of any sort of brand awareness by customers. Do you have any evidence of that in the record? There is no evidence in the record of brand awareness. No. Isn't that a problem, though? Fundamentally, how can there be likelihood or probability of confusion when nobody is aware of your client's brand? If that were the case, if that were true, then every new product that launched would not be entitled to trademark protection until it became pervasive in the minds of consumers. That's why there's a distinction in trademark law among likelihood of confusion versus dilution. Small businesses are entitled to attempt to sell their products to claim trademark rights. They don't have to show that their product has become ubiquitous in the minds of consumers. They do, again, for dilution, but this is not a dilution case. This is a trademark infringement case, and all we have to show is he made sales, he was using his trademark, he had registered the trademark, and it's a valid trademark. But if nobody buys the Heinz product confused into thinking that it's actually the Perry product, then what is the trademark injury that you're alleging? Well, that's – so if I understand the question – Isn't that the purpose of the whole trademark doctrine, all these doctrines, is we don't want consumers to be tricked into buying one thing thinking that it comes from somebody else. It's to protect from a likelihood of confusion. Right, the likelihood that somebody is – that a new vendor is coming in and essentially sort of seizing the goodwill of the other company. So Mr. Perry has a federal trademark registration for his product. He has made active attempts to try to get his products in store shelves. This is an ongoing effort. Let's say he does get his product in store shelves, rouses, decides to pick it up, puts it on a store shelf. Now you have on a store shelf, you have matchup and matchup right next to each other. I could see somebody calling up, honey, while you're at the store, please pick up a bottle of matchup. What do they say, matchup, matchup? It creates a likelihood of confusion. We don't have to show actual confusion. In fact, that's what this court previously held in the Smack Apparel case. Actual confusion is not necessary for a finding of – But your hypo I think is a good one. Your hypo presumes that there is somebody calling their spouse saying please get the Perry product and they inadvertently buy the Heinz product. Yes. Is there any reason to believe, is there anything in the record to suggest that that's a genuine phenomenon? That people are looking for the Perry product and are tricked by Heinz into buying the Heinz product. Well, again, that's – what you're asking is, is there any evidence of actual confusion? And the answer is no. You're hypothetical. There is no evidence of actual confusion. There is evidence of a likelihood of confusion based on the totality of the digits of confusion. What is that evidence, Mr. Harris? What is the evidence of the likelihood of confusion? This is – we briefed this extensively in the briefs. There's eight digits of confusion. We addressed that seven, a full seven of the digits of confusion weigh in Mr. Perry's favor. The digits of confusion concern – Are you talking about Dr. Henke's testimony? Dr. Henke's testimony, there was – Her testimony is the only evidence you have of the likelihood of confusion. No, I wouldn't say that, Your Honor. The goods themselves are identical. That's undisputed. That's from Kraft Heinz's own testimony. The marks themselves – first of all, there was a likelihood of confusion between match-up and match-up. Dr. Henke didn't do a consumer survey. Dr. Henke did not do a consumer survey. That is correct. We have no empirical evidence of this confusion, the likelihood of confusion. We have actual confusion. That is correct. But again, as of course noted in Smack Apparel, actual confusion is not necessary for proving likelihood of confusion. In fact, we don't even need to show a totality of the digits of confusion. Here, we did. We addressed a full seven of the eight digits of confusion as weighing in Mr. Perry's favor. The one sole factor that we did not address is actual confusion, and that is the sole basis for the court's decision to dismiss Mr. Perry's claim. I agree with you. You don't have to have actual confusion evidence. But I thought you do have to have evidence that you're worried that this is going to happen. You may not be able to prove it definitively, but you have a genuine concern that consumers are going to want Perry and be tricked into buying a Heinz. What is your evidence of even the remote probability or possibility of confusion when people don't seem to know this brand? That's the digits of confusion. That's when you go through and determine is there a likelihood of confusion. You're telling me that they look the same or look similar. I'm talking about who is aware of the previous brand. Again, I think that addresses the issue of actual confusion, which we are conceding we don't have evidence about. We don't have to show, again, that the mark is ubiquitous in the minds of consumers. That would be a dilution claim. For a trademark infringement, we just have to show likelihood of confusion by showing the similarity of the marks, the similarity of the goods. Here, they're virtually identical. For Metchup and Metchup, they are identical. We have the identical use of trademarks used on identical goods. For Metchup and Mayochup, the marks are confusingly similar. That's where we look to the Dr. Hanke testimony. She reviewed numerous third-party statements where they were asking, how do you pronounce this? Is it pronounced Mayochup? Is it pronounced Metchup? Confusion is rampant on this issue. I grant you that there may be confusion about how you pronounce these words. That's different from the confusion that I think we're supposed to look at. One thing would be, I'm confused whether Heinz wants me to pronounce it this way or that way. A different confusion would be, I think this is Perry's product, not Heinz, and I want the Perry product. Then I think what the court is asking, if I'm understanding correctly, is essentially a reverse confusion. This is a situation where you have a smaller competitor who is not as well-known in the marketplace. A larger competitor comes out, takes the smaller competitor's trademark, and now people assume the senior user of the mark is the infringer. Or that their products are somehow fraudulent. That's the situation we have here. That's what we have pled. Again, we don't have to show that Mr. Perry was making sales comparable to Kraft Heinz in order to make this allegation. Mr. Perry has the right to put his products on store shelves, and now we have a situation where you have two products, Metchup, Mayochup, sitting on a store shelf, identical goods. That is likelihood of confusion, and that's the issue that we addressed in the brief. If there's no more questions on that, or is there any questions on the cancellation of Mr. Perry's trademark? You mentioned earlier that your client was actively trying to promote the brand by putting on store shelves. Is there evidence of that before Heinz took action, or only after? No, there is no documentary evidence that Mr. Perry was trying to put it on store shelves prior to Kraft Heinz taking his trademark. That's correct. Returning back to the issue in the first assignment of error on de minimis use, this is an affirmative defense. It has to be specifically pleaded. Kraft Heinz didn't plead the affirmative defense. They moved three days prior to the close of discovery to try to add it. The magistrate judge denied that as, quote, clearly and obviously untimely. And Kraft Heinz then moved for reconsideration. That was denied. Kraft Heinz did not appeal the decision to this court, did not ask for judicial review of it from the trial court. Instead, the trial court granted summary judgment on an affirmative defense that was never actually pleaded in the case. Even if it was pleaded, de minimis use is improper in this case. What are the minimum number of sales sufficient to sustain a federal trademark registration? Is it a specific dollar amount? Is it a sales volume? Is it a comparison of sales versus other competitors? And how do you judge small businesses? Was the bona fide use element or defense preserved? Was the bona fide use element preserved? I'm sorry, I don't understand the question. I'm sorry if I'm not as familiar with the terminology as you are. I'm sure I'm not. I get that there's a de minimis argument, but isn't there a separate textual basis for cancellation, which is the bona fide use? So there's only two grounds for statutory losses. There's only two ways to invalidate a trademark. Discontinuance of use for three years. That doesn't apply here. The other ground is failure to make bona fide use of the mark in commerce and that the use is a sham use. That the use was essentially to preserve or maintain rights to a trademark. Right. You said that the de minimis was not timely pled. Is there a preservation problem with bona fide? That's the same issue, Your Honor. It's the same issue that the de minimis use that Kraft Heinz was granted summary judgment on the basis that Mr. Perry did not make enough sales, didn't meet some unknown and arbitrary sales standard. And what we're arguing is that that's that's not the law. And no, there is no defense that he did not make bona fide use of the mark. But that's also not what the court ruled. But how do you judge a small business? Do you judge it as against other mom and pop shops or do you judge it against Kraft Heinz? Against multinational corporations? Obviously, it's not a big company. I get that your client's not a big company, but is your client doing anything to actually try to build this brand other than just selling within the four corners of the hotel? Absolutely, Your Honor. In addition to selling out of the hotel, he was he there is evidence in the case that he had made out of state transfers to grocery stores to Florida and grocery stores in Louisiana trying to get his product on store shelves. He had also prior to Kraft. And I'm sorry, this is after or before Heinz took action? That is after. Before Heinz took action, he had given product samples to his brother to make sales in the Orlando area. There's there's evidence of that as well. That was before Kraft Heinz did anything. So, as noted, there is no. You have saved time for rebuttal. Your time has expired. Thank you, Your Honor. Safe clean. Thank you, Your Honor. May it please the court. Mr. Perry had more than 10 years to make bona fide use of his matchup mark. He had 10 years to learn what laws govern the sales of food products and make sure he was in compliance with them. 10 years to reach out to retailers and try to get on store shelves. 10 years to advertise, market, promote his products. He did not. Notwithstanding counsel's characterizations of what was done, the actual evidence shows that for 10 years, Mr. Perry did nothing more than make an occasional trip to Walmart to buy condiments and spend a few minutes in his kitchen putting those condiments into a half dozen plastic squeeze bottles. When I say he did it occasionally, he did it on average of once a year. Once a year, he filled six plastic bottles with condiments that he bought from Walmart, stuck matchup labels on them and put one or two on a table in his motel lobby and then called it a day. And you can see what his lobby table looks like. It's in the appendix at page 2210. It's a little handmade, handwritten sign that says matchup $5, surrounded by notices about checkout times and key deposits. That is not a bona fide use of the matchup mark in commerce that can support a federal trademark registration. This isn't a question about small business owners versus big business. It's a question about making bona fide use of a mark in commerce. Is there evidence to show he was really trying to build a presence, a market presence for the product? And there just isn't. Trademark rights are established by use, not by registration. And the use, as Your Honor has recognized, must be a bona fide use made in the ordinary course of trade and not made merely to reserve a right in a mark. And if you fail to do that for three consecutive years, that's prima facie evidence that the mark has been abandoned. And that's grounds for cancellation, even of an incontestable trademark. Now, what constitutes bona fide use? And Your Honor, this gets to the point of what was pled. We pled that he had not been using the mark in commerce. Bona fide use of the mark in commerce means that the use has to be lawful. It has to be in interstate commerce, meaning that it's marked goods that are being transported and sold in interstate commerce. And it has to be done in connection with the goods that are recited in the registration. And Mr. Perry did none of that. If he were selling matchup in interstate commerce, as counsel now claims, and as Mr. Perry claimed, only in an affidavit that he submitted after he had been deposed. If he were selling matchup in interstate commerce, then he was required to comply with federal labeling laws. And we cited the specific regulations on page 26 of our brief, that those laws include the requirement the label on his products clearly identify the manufacturer of the product. By name and address. A food product that does not have that information on its label is deemed misbranded as a matter of law and its sale is illegal. And I would refer the court there to 21 U.S.C. 331 and 21 U.S.C. 343. It has long been held by the Trademark Trial and Appeal Board that to support a federal registration, use of a mark must be lawful. The Ninth and Tenth Circuits have affirmed that rule, as have district courts within this circuit. In our briefing, we talk specifically about the Ninth Circuit's decision in Criagri v. Usana, in which the court affirmed summary judgment of cancellation of a mark on grounds that the mark in question was being used on vitamin supplements that did not meet federal labeling requirements. And the Ninth Circuit explained that the reason why use must be lawful and the reason why a registration should be canceled if the use is not lawful is twofold. And this is now quoting from the Ninth Circuit. First, as a logical matter, to hold otherwise would be to put the government in the anomalous position of extending the benefits of trademark protection to a seller based upon actions that the seller took in violation of the government's own laws. It's doubtful that the trademark statute passed pursuant to Congress's power under the Commerce Clause was intended to recognize shipments in commerce in contravention of other regulatory acts promulgated by Congress under that same constitutional provision. Second, as a policy matter, to give trademark priority to a seller who rushes to market without taking care to carefully comply with the relevant regulations would be to reward the hasty at the expense of the diligent. And the Trademark Trial and Appeal Board has repeatedly cited CREAGRI with approval for the proposition that use of a mark must be lawful to support a federal registration. In this case, it is undisputed that Mr. Perry's labeling has never met the requirements of federal labeling laws and that his use of a mark has never been lawful. The reality, though, is that Mr. Perry was not selling matchup in interstate commerce. He produced receipts for 34 sales over a period of 10 years. None of them reflects a sale to a non-Louisiana resident. He testified in his deposition that he has no records to show where his motel guests reside. And his attempt to cure that deficiency is simply with a post-deposition declaration in which he swears that he knows he sold matchup to someone from Texas and from other states. He doesn't say who. He doesn't say how he knows that they're from Texas or from some other state. That affidavit lacks foundation. It's not admissible evidence and it can't be used to defeat summary judgment. His failure to use the matchup mark in interstate commerce, there's no evidence to show he used it in interstate commerce and that's a separate cancellation of his mark. The requirement that a mark has to be used in the ordinary course of trade, which is the language of the statute, that was added by amendment in 1988. And the TTAB has explained that the purpose of that amendment was to eliminate token use as a basis for registration and impose a higher hurdle for the quantum and nature of use. And the TTAB has cited the Senate report, which made clear that that revised definition, in the ordinary course of trade, should be interpreted to mean commercial use, which is typical in a particular industry. And I refer the court to Nation Star Mortgage versus Mujahid Ahmad, A-H-M-A-D, 112 USPQ 2nd, 1361, from 2014. Mr. Perry has never made commercial use of the matchup mark, as would be typical for the food industry. The record evidence shows, and he's clearly testified in his deposition, that over a period of 10 years, he made no more than nine or 10 batches of matchup, meaning nine or 10 batches of six individual squeeze bottles, 50 or 60 bottles in all. So we're talking about an average of six bottles a year that he made, which he either stuck in his motel lobby or used himself or gave away. In all seriousness, Your Honor, I've made more loaves of sourdough bread in the past year than Mr. Perry has made of matchup in each of the 10 plus years that he has held a registration for that mark. And I can also tell you that it's probably taken me far longer to make each of those loaves of bread than it took him to mix a couple of condiments into squeeze bottles in his kitchen. After 10 years, there is no presence in the market of Mr. Perry's matchup. And Your Honor, correctly noted that he didn't start even trying to get... I think Judge Graves is trying to ask a question, but he's on mute. I'm sorry, Your Honor. It's not your fault. I think we just need to unmute him. I failed on mute. Go ahead. Don't worry about it. I'm happy to entertain questions, Your Honor. I've been talking for a while. Okay, I'll keep going then. But after 10 years, and Your Honor, Judge Ho, you correctly noted, Mr. Perry made no effort, and his counsel has admitted, no effort to try to get his product onto store shelves until after he sued Kraft Heinz and saw that we had pled for cancellation of his mark on grounds of abandonment. And this court has held... Do you agree that... Do you agree, just to take it hypothetical, if a business, a small business is actively trying to get a brand onto store shelves and it's a new contested mark, that that would be enough to be bona fide? Or are you saying that it actually has to be a successful launch onto store shelves? No, Your Honor, I would say if there were bona fide attempts to get onto store shelves, if you saw the small business owner knocking on retailers' doors and advertising and trying to create brand awareness, that that would be probative evidence of a bona fide intent to use. Your point is there was just no effort. Correct. There was no effort. There was no effort. And then what you would look at, assuming there were a bona fide intent to use, you get to the likelihood of confusion and whether there is a meaningful risk that consumers are likely to be confused. And here we just never get there because there was no effort made. And this court actually has held in the Action, Inc. case, Action, Inc. v. New York Jets, 576, Fed Appendix 321 from 2014, that when you have a trademark holder who has no meaningful presence in the market, has made no effort for a period of many years to establish brand awareness and goodwill in its mark,  but no reasonable prospect of it, then the trademark symbolizes nothing. It's been abandoned and the registration should be canceled. Because the district court correctly held that Mr. Perry's federal registration should be canceled, infringement claims fail accordingly because he only pled infringement of a registered mark. He did not plead infringement of an unregistered mark. So if he has no registered mark, he has no basis for claiming infringement. But even if he had asserted infringement of an unregistered mark, the district court correctly held that no reasonable jury could find that consumers are likely to be confused as to the source, sponsorship, or affiliation of the party's products. And again, Your Honor, you correctly noted, that's the kind of confusion we're looking at. Are consumers likely to be confused into thinking that one party's product is made by, affiliated with, or sponsored by the other party? In this case, you always, as this court has repeatedly recognized, you have to consider the marks as they are actually used in commerce, as consumers actually perceive them in the marketplace. Here, obviously, we have the problem that consumers don't perceive Mr. Perry's mark in the marketplace because it has no market presence at all. And he's made no attempt to get there. But even assuming that he had some market presence, that it was possible for consumers to encounter the party's products, just looking at the products side by side, as shown on page 35 of our brief, and the district court properly recognized this, the marks in their entirety are completely dissimilar. They're used in different ways. The bottles are different. The labels are different. If you want to look at the word marks themselves, the word marks are different. But looking at Mr. Perry's squeeze bottle, compared to a bottle of Kraft Heinz mayo chop, the district court properly held that no reasonable jury could find a likelihood of confusion. I'm happy to take questions, but to answer the question, since Mr. Harrigan raised it, of waiver. We specifically pled, from the beginning, in our first answer, that the plaintiff's claim should be dismissed. We raised it as an affirmative defense and in cancellation that the plaintiff has not used and does not use the asserted match-up mark in commerce and has not used and doesn't use it in commerce in connection with the goods described in its registration. And that to the extent he ever used it in commerce, he no longer does so and he's abandoned it. So having pled abandonment and lack of use in commerce, that necessarily invokes the inquiry of whether he's made lawful, bona fide use in the ordinary course of trade that is non-de minimis. We respectfully submit that the magistrate didn't understand that, but the fact is we're here now arguing the merits of all of these defenses and there's been no harm. Ms. Quinn, in terms of your de minimis use defense, that's not one of the defenses that's listed in the Alanamax section addressing incontestable trademarks, is it? De minimis use is captured by the concept that the use has to be bona fide use in the ordinary course of trade. It's that in the ordinary course of trade language that captures whether the use is of what's expected in the industry. And abandonment is a statutory grounds for cancellation of a federal registration. And abandonment can be proven by, among other things, three consecutive years of non-use. So the concept of de minimis use is part and parcel of whether the mark is being used in commerce in the ordinary course of trade rather than merely to preserve rights in a mark. And so if we get to abandonment, though, as a defense, because you're telling me your de minimis use defense, even though it isn't explicitly listed in the Lanham Act, you're saying it's captured by this bona fide use phrase? Yes, Your Honor. I'm sorry, Your Honor. Go ahead. To preserve the federal registration, you have to make bona fide use in commerce in the ordinary course of trade rather than just trying to preserve the mark. If you don't do that, you abandon the mark and your registration is canceled. You have to continue, you have to make use and continue making use of a mark to maintain a federal registration. All right. Well, and as regards abandonment, the party who claims abandonment as a defense has a heavy burden. You agree with that, don't you? I do, Your Honor. Well, didn't the district court in this case find that, well, I'm going to quote, they say he failed to produce any evidence to show any sales of metric branded products outside of Louisiana or to non-Louisiana residents. Doesn't that sound like the district court put the burden on Mr. Perry? I don't think it's entirely clear, but what actually happened was we came forward and made our prima facie showing that there had been no sales in commerce. There had been no use. And so the burden of production then did shift to Mr. Perry to come forward with evidence to show that abandonment should not be inferred from the circumstances. And again, I'd refer Your Honor to Action, Inc. on that, so 576 Federal Appendix at 323. So once the party asserting abandonment makes that prima facie showing, the burden shifts to the mark owner to establish that circumstances do not justify an inference of abandonment. And I think that's what the court was addressing here, Your Honor. Well, now his testimony was, though, that he sold Metchup to hotel guests who came from all over the place. That's what he said. That was his testimony. So the burden was on him to prove that he sold it to people from all over the place? Yes, Your Honor. Once we've made the prima facie showing, we looked at all of his receipts. We said, here are your sales receipts. There's nothing here to show that these sales were made to anybody outside of Louisiana, and you're not on store shelves, and you've only made six bottles a year. The burden did shift to him to come forward with admissible evidence that would be admissible at trial to survive and at trial, Mr. Perry would not be allowed to get up on the stand and say, I happen to know that these people are from other places. He'd have to come forward with some foundation, with some evidence to show where these people are from, to identify who they are and show where they're from. There's no admissible record evidence to support that statement. And so you don't think abandonment requires that there's a complete discontinuance of the use of the trademark? There has been use, bona fide use in commerce in the ordinary course of trade. It has to meet, the use has to meet the statutory definition of use in 15 U.S.C. 1127, I think. And if it doesn't meet that definition of use, then the mark has been abandoned. All right. I'm looking at electro source, which is a Ninth Circuit case, where essentially what the Ninth Circuit said that even a single instance of use is sufficient against the claim of abandonment. It can be if it's bona fide, your honor. If that use were in the context of, for example, someone who really is trying to get a fledgling business off the ground and just made their first sale after, you know, beating the streets and knocking on doors and trying to promote and sell it. It's not bona fide because he's only trying to sell it in his hotel? It's not bona fide because it's not what a true small business would do. That sounds pretty subjective. Your honor, I mean, there is some subjectivity to it. But again, we can come back to the multiple reasons why his mark has been abandoned. Again, lawfulness is a problem for Mr. Perry, and there's no dispute that his labels have never met federal labeling requirements. So if he was selling matchup in commerce, he was breaking federal law, and that unlawful use does not support a true small business. Again, his mark has been abandoned and should be canceled. Is your point essentially that there are minimal sales here, but they're so minimal that it feels like they're just trying to reserve the mark, which is part of the bona fide standard, right? Yes, your honor, that these are, at best, token uses intended to preserve the mark. I take it if he had been doing not just the hotel sales and the hotel marketing to sort of show that he's trying to do something, doesn't mean it has to be successful, but just some effort to expand beyond the $9 market. I think you're saying that would be enough to survive cancellation. It's just that he isn't that bad. Yes, your honor, you need to look at the totality of the circumstances, but he has to show bona fide intent, a bona fide use in commerce, and that includes meaningful advertising, real effort to try to promote his brand. I find that quite convincing, candidly. But is that a fact issue? Isn't that a fact issue, or is that a legal issue that we can do as an appellate court? Well, it's a fact issue, but when no reasonable jury could find, to the contrary, summary judgment as appropriate on questions of abandonment as with anything else. And that's what the district court found here. There's no evidence of bona fide intent to use. And there's no evidence of lawful use, and there's no evidence of reasonable judgment. This court has upheld summary judgment in trademark cases on fact-intensive questions like secondary meeting and likelihood of confusion and abandonment. It's a question of whether a reasonable jury could find, to the contrary, and this is just not that case. So with that, your honors, again, I would suggest that the district court properly found abandonment, that the plaintiff had made no lawful use of the match-up mark in commerce. And so his registration was properly canceled. With his registration having been canceled, he has no claims for infringement, and even if he did, the district court properly found that no reasonable jury could find that consumers would likely to be confused as to the source affiliation or sponsorship of either party's products, even assuming any consumers knew of Mr. Perry's products at all. Thank you, Your Honor. I'll recede the remainder of my time to three seconds. Mr. Harrigan? First of all, the issue of this bona fide use in commerce. Respectfully, counsel is creating a new standard or changing the language of section 1127 on abandonment when she talks about the bona fide use in the ordinary course of trade, that this wasn't that. And because the reason is because he didn't make enough sales. That's not what the law says. And importantly, this court has held on numerous occasions that, and this I'm referring to the Golden Flake case, that trademark abandonment is in essence a forfeiture. And forfeiture is strictly construed against the defendants. And not only that, in the Cadillac Coupe de Ville case, this court held that statutes interpreting forfeiture must be strictly construed. So you have to strictly construe 1127 on abandonment. The question is, were his sales bona fide? In the ordinary course of trade, or were they merely to reserve a name and a mark? Now, what does that mean? What that means? And there's numerous cases on this issue. The best case that I would point to on this is the SC Johnson case that did a survey of all the de minimis use cases and said that the thing that they have in common is they focus on whether or not it was a small business trying to legitimately make sales to arm's length third parties versus a company or a subsidiary to try to keep its trademark alive or selling to a friend in order to keep a competitor. You understand why this feels very similar to just selling to a sub? Well, I mean, what you've got here is they haven't, I forget the relationships, but they're just selling to the hotel lobby of a hotel that they already own. This feels like a very convenient, easy way to maintain the mark. Can you tell me a story as to why your client was not happy that only nine dollars a profit was actively trying to do more than nine dollars? OK, on this issue, I would say that, first of all, selling in his own hotel, I don't see how that's any different from any small business selling in its own store. It's the same thing. This is a it's a location he owned and he was selling his products out of his location to consumers. And, you know, he was working on expanding his business. As I mentioned, he made transfers to his brother to sell in the Orlando area to try to market it in stores. That's in the record. He he also made the transfers to the stores themselves after. Just to be clear, that was after 10 years after you. I was before. Yes. And I guess I would also like to refer this case to this court to the Christman case out of the federal circuit, which flatly rejected the new sales quota standard that was created by the court held that quote. But in fairness, I don't think anybody is trying to do a sales quota case. I would fully accept low sales, but a bonafide effort to bonafide, albeit unsuccessful effort to build a real business. My concern is it seems to me, based on the record, I may be wrong. Your client was perfectly happy doing nine dollars because all this was was to preserve the mark and hope that a company like Heinz sweeps in and you basically charge him for a sale. That would be an indication of a sham sale that he was just making sham sales to keep his trademark alive. That is there. There's no evidence of that. There is evidence of arm's length, third party sales to hotel guests. Now, I understand that Kraft Heinz does not believe he had enough sales. They ridicule the amount of sales that he had. He was trying to get it in store shelves. He was trying to get it in the Orlando area. He was doing what he could. Granted, he does not have the resources of Kraft Heinz. That doesn't mean he's not entitled to trademark protection. What about the labeling issue? The labeling issue? I realize I'm short on time. We address that fully in our brief. This is a red herring of red herrings. Here is a paragraph in CFR 2.69 where it says that the trademark office when examining a trademark quote, may make appropriate inquiry as to compliance with such act for the sole purpose of determining the lawfulness of commerce recited in the application. What does that mean? It's referring to controlled substances. Can I get a trademark on marijuana? Can I get a trademark on drug paraphernalia? It even says that in the act I refer the court to what we're talking about here is minor labeling violations that were corrected. And this is under the cottage food industry, and just to wrap up momentarily, the Louisiana cottage food law, the penalty for failing to comply with this is a $25 fine that can only be assessed after he's put on notice. He didn't receive any notice and he's already fixed the minor labeling mistake. If this were the case, restaurants could lose a health code violation or anything else. It's a red herring, Your Honor. Thank you, counsel. That concludes the arguments in this case. The court will take a 10-minute recess.